Thank you. Good morning. May it please the court. My name is Erwin Chemerinsky. I represent the appellants. I'd like to save three minutes for rebuttal. Okay, we'll try to help. Thank you. There are two issues before the court. First, did the district court err in not creating a common fund? And that would be for the period of 2008 to 2015. And second, did the district court err with the fees it awarded under 1021.5? If there's no common fund, that would be for the there is a common fund, it's just for the period of 2015 to 2021. With regard to the first issue, the common fund, there are five questions before the court. For the sake of clarity, I want to identify them, even if they're not time to discuss all of them. First, is this appeal on the common fund time barred? Second, does the settlement agreement preclude a common fund? Third, are the requirements for a common fund met? Fourth, could the court create a common fund? And fifth, how much should be in the common fund? This is the first question. Dean, before you move forward on those, I just want to ask a very practical question here. As you know, I'm among those that have been in this long, long, long standing case for I think 12 years now. And what strikes me right now is just a real practical problem. Your clients have represented a lot of different entities, some of which are probably not even in business now. The funds have been distributed. I have no idea how many of them are still viable. Judge Snyder, I thought rather carefully, went through the practical problems that exist in your getting a recovery from the common fund. What she said made perfect sense to me. But let's just say arguendo, that you're absolutely right, that the times you want covered are covered by the common fund recovery, that there's an award to that effect. What does that give you? How are you helped by that? This goes to the fourth question that I posed. Can the court create a common fund? And as this court indicated previously, and as Judge Kristen said in her concurring opinion, there is the possibility of a common fund. Many of the providers who benefited enormously from the increase, benefited by $3 billion, still exist. The common fund can be created by clawing back money for them, or also by simply withdrawing a percentage from future payments to them. It's not that all the money can be recouped, but the fact that not all can be recouped isn't a reason not to recoup some and create a common fund, your honor. But you can't get the state to insert itself in, for example, withholding a portion of future payments because of the settlement agreement, can you? No, your honor, that's not correct. This goes to the second question. The settlement agreement says that there is not going to be a common benefit theory. It doesn't speak to the common fund. The reason it doesn't speak to the common fund is that the district court in 2010 rejected it, something this court found to be an abuse of discretion. What's important is if you look at the language of the settlement agreement, and here your honor I'm pointing you to Roman numeral 3C1C, which is 8 excerpt of record 1765, it says that the state does not have to assist the attorneys, and I want to your honor, a common fund is the court creates it. The state would be assisting the court in doing this, not the attorneys, and the state repeatedly in its brief quotes this language that they don't have to help the attorneys. That's not what a common fund is, your honor. A common fund is the court creates it and it assists the court. Let me ask you a question along that line. Sounds to me as though you made two arguments. Number one, that the limitation on whatever assistance can be provided doesn't apply here because this is a common fund rather than a common benefit, and second, you're saying that this is not an assistance to the attorneys. Both of those seem to me rather difficult arguments. A common benefit, common fund, those are essentially the same idea. I understand they're different words, but the idea is fairly similar and maybe even the same, and certainly this is an assistance to plaintiff's counsel. I understand that the assistance would also be to the court, but obviously you're helping the plaintiff's counsel. I find both arguments a little difficult. Let me address each in turn. There is a tremendous legal difference between a common fund that is created and a common benefit. A common fund is what the Supreme Court was describing in Boeing versus Gemin. It's exactly this situation where a group of individuals benefited, but they didn't have to pay for the costs of litigation. A common benefit is not paid by the beneficiaries, but would be paid by here, the state of California, and the district court in 2010 rejected a common fund. It was not on the table when the settlement agreement was negotiated. What the settlement agreement was addressing was common benefit. But Dean, even if you're right about the difference between a common fund and a common benefit, what's the problem here? As I read it, the January 24, 2020 order by Judge Snyder awarded attorney fees against the state under 1021.5. What are we arguing about in connection with the common fund? You have a judgment. Now, I know the state disagrees, but you have a judgment, if you will, against the state. Why don't you just go collect that? It's an enormous difference in amount, your honor. That's what we're arguing about, is the amount? Absolutely, both with regard to the common fund and the 1021.5 fees. The common fund is $3 billion. The state in its brief in Armstrong said that it had increased state funding by $1.5 billion, and the federal government met that, which is $3 billion. Usually, a common fund recovery is 25%, but with a large fund, it's 9%. We're talking about 9% of $3 billion compared to $2 million. In a moment, I'll get to the 1021.5 fees. To go back to Judge Fletcher's second question, it's very important to construe the settlement agreement literally. The settlement agreement says that the state doesn't have to help the attorneys in going out to collect the money. Judge Fletcher, that's not what a common fund is about. The common fund is something created by the court. If this was meant to Let me ask you a different question then. Assuming for the purpose of my question that I agree with you, that means that subparagraph C just doesn't apply. Do we need some affirmative authorization to seek attorney's fees based upon common fund? Because if paragraph C doesn't apply, there's no affirmative authorization in the settlement agreement at all to recover fees out of a common fund. That's correct. The settlement agreement then is silent. Then the question is, are the requirements for a common fund met? Here, I would point you to this court's case in the Paul Johnson- My question is somewhat different. There are three paragraphs that talk about attorney's fees. It's, I think, at least a plausible interpretation of the agreement that this is a little limit as to how attorney's fees might be recovered. Your Honor, there's no reason to interpret it that way. Here, I would go back to the 2010 decision of the district court, which denied the existence of a common fund. When the settlement agreement was negotiated, the common fund was not on the table. If the state wished to preclude the common fund, it could have said so, but it didn't do so under these circumstances. Do you agree that recovery of attorney fees under a common fund, there's not joint and actually got? If you had 100% of the, if you will, beneficiaries, half of them are out of business now. You say there's a whole lot more money. You could only recover 25% in your mind against those who still survive and who received a certain amount of money. That's correct. Those who benefit from this should be paying for that which they benefited. That creates the common fund. Admittedly, the whole $3 billion isn't going to be able to recover. I'll go back to earlier, Judge Smith, the fact that not all can recover doesn't mean that none should be recovered. Let me shift to the alternative theory because if there's no common fund, then it's about 1021.5 attorney fees. Here, I think the district court made three errors. First, it cut the number of hours arbitrarily by 50%. Second, it reduced the billing rate, again, arbitrarily from what was to about $650. Third, it applied no multiplier to the load start. Given all of the factors that are present here, that should have been done. Judge Smith, to go to your question, rather than the $2 million that were awarded in attorney fees, $2,700,000, it should have been a substantially higher sum than that based on giving all for the hours, the higher hourly rate, and a multiplier for the load start. Let me ask you this. You're a very bright guy, a very practical guy. At least one of your clients has already received, I think, over $2 million in fees. Judge Snyder, I thought, actually, did a very, very thorough job of analyzing the fees. She had the Declaration of Karma and the Greenfield Declaration and court's own knowledge because she's handled this for all years. We're talking about an abusive discretion standard. How do you get around that? I mean, it's not like she was way off in the wild blue yonder not dealing with the facts of the case. Your Honor, to cut the fees arbitrarily by 50% was an abusive discretion. It simply wasn't justified. Dean Chemerinsky, could I ask a question about that point in particular, and then I speak to the multiplier. But on that point, you say it's an arbitrary. There often are. We talk about haircuts of 10%. Appellate courts don't often get really into the weeds. In the district court here, given the size of this fee award, admittedly, it's sort of a lop off. But I'm concerned that the reason that was done was twofold. Part of it had to do, I think, with comparing the total right. And part of it, I think, is viewing him, and she makes this very clear, the district court's very clear that she viewed Friedman as a subordinate at 22. It's unreasonable for a subordinate or understudy to bill 3,000 plus hours. And of course, Karman used the word understudy. And people in this, I think both sides in this briefing, view that as some kind of a diss. But it strikes me this is a very unique billing situation because Karman anticipated, his client certainly anticipated, they might not be able to carry this all the way through. So what he said is that Friedman was an all-star understudy, pitch hitter, whose job was to sit on the bench, understand every document sent to me and the impotent, and read the pertinent place, and be ready to step in at a moment's notice. So as if he were going on stage in a true understudy role, entirely redundant. If I view it that way, it doesn't seem to me to be a diss. It seems to me to be necessary in this unique circumstance. So I'm taking a long time to get to my question. But trial court judges, if this were hourly, I would expect a trial court judge to say that is redundant. Nobody's going to pay for that. It's double billing. But here is contingent. I don't see any double billing. And Karman says the latter eventually happened when I was unable to make oral argument at the crucial emergency motion. It was telephonic. He couldn't participate because of his hearing impairment. Friedman, on a moment's notice, stepped in, argued successfully, and so far, you know the rest of this. And given your memory, you could probably do it better than I without looking. But that's the thing that I think may have been lost here in the translation. And I'm really concerned about that. So what am I, that's for both lawyers. I would really like to hear about this. To me, seems to be a fundamentally different structure. Let me address both points. And then I'd like to save the rest of time for rebuttal. Let me address just a minute. This may well run over time. So relax, answer the question, and we'll make sure you get a chance to respond and rebuttal. Thank you so much. As to the first, the role of Hooper Lundy, they were involved only in representing the non-hospital providers. They had a very limited role and should not be the basis for determining the attorney's fees for Mr. Friedman. Second, in terms of the 50% cut, Mr. Friedman spent 10,000 hours on this matter. With all due respect to Judge Snyder, I think here it was an abuse of discretion to regard Mr. Friedman's role as an understudy. I think we detail in the brief all of the reasons why Mr. Friedman was a primary attorney, including- You do. You do. And I read him and we've all read him. But I guess my point, Dean, is what if he was an understudy ready to step in, since he had to be up to speed and apparently was really doing it, he was ready. And she makes that point. He not only- Carmen makes the point because he was ready to step in and successfully argue this key motion. But the district court judge said, I don't believe these have been fabricated in any way. The problem is, are they justified in the circumstance? I think this was what was bothering her. And I'm not sure even this gets me to a 50% reduction. I don't know how it can get to a 50% reduction. I know the phrase haircut also, which is usually a 10% reduction. Right. A 50% reduction is simply not justified here. And nor was it justified to add no multiplier to the Lodestar, nor was it justified to just arbitrarily say, we're going to decrease the $899 to the Hooper-Lunder blended billing rate. Could you go to the multiplier for a minute, please? For both counsel, I'm really interested. Again, left us a record about what factors she considered, including that it's public money. It's a pretty modest multiplier that was given on the other side, just 1.5. Is there any factor she cited that does for HLB's fees that doesn't also apply to Friedman? Well, certainly HLB, the factors that apply to them would benefit Friedman. But I think that what Friedman was doing deserves much larger multiplier than what HLB was doing. HLB was representing the non-hospital providers. It was intervening in a very limited way. Friedman basically devoted his career to this, to benefit the public interest. Judge Christin, we've got to remember, it was a $3 billion benefit to Medicaid beneficiaries in this state as a result of Friedman's efforts. And that's what I don't think is taken into account. And that makes this different than Hooper-Lunding. The other side pegs that number far lower, almost much, much lower. Can you speak to that? Yes, I very much want to. Let me tell you where the number that I have comes from. In the state's amicus brief in Armstrong, and you find this in 10 Excerpt of Record 2170. And this is a brief that Mr. Sonheimer signed on to. It said that the California legislature increased the Medicaid appropriations by $1.5 billion as a result of litigation. The federal government then matched it. Now there's two other numbers that are mentioned here. Well, one is the $70 million figure. But that was for six weeks only, and only for the providers who are charging at a reduced rate. The other figure is the $367 million figure. That's the figure that the intervener, Hooper-Lunding, mentioned. But that was the benefit to non-hospital providers. So if you look at the total benefit by the state's own admission, it comes to $3 billion. And so I know I've used more than my time. I can pause here and save time for whatever time there's a rebuttal. Let me ask any further questions from the bench at this time. Not at this time. No, thank you. Well, you sought to reserve three minutes. We'll give you three minutes on rebuttal. Thank you, Judge. Sonheimer, you're up. Good morning, Your Honors. Joshua Sonheimer for Appellant, the Director of the California Department of Health Care Services. The District Court's order should be affirmed for several fundamental reasons here, Your Honors. First of all, with respect to Appellant's common fund claim, the appeal is untimely because it was filed more than 30 days after the District Court's order denying their common fund motion. Even if the court reaches the merits, the plain terms of Appellant's make here that the department should be obliged to assist them or the court in recovering funds from which to pay a common fund award. With respect to the private attorney general award, Your Honors, Appellant's failed to demonstrate any clear error by the District Court. The award is substantial, particularly given that this matter never proceeded past the issuance of a preliminary injunction and involved virtually no discovery. Counsel, let me ask you this. It sounds like, since you're asking us to affirm the District Court, it sounds like the state is conceding that there is an award of 1021.5 PAGA fees here. The only question is the amount, if we proceed on that as opposed to the common fund. Is that your understanding as well? If I'm following the question, Your Honor, we have not contested the award. We certainly contested below that, as you know, that there was entitlement to an award. But you're not contesting it anymore. To the degree we're talking about PAGA money, it's the amount, not the liability. That's correct, Your Honor. Okay, thank you. Counsel, to that extent, if you could go to PAGA for just a minute, I'm just very concerned that we should be concerned about disincentivizing the next lawyer who comes along who's willing to take up one of these battles. It's going to be David and Goliath's circumstance, and there's no question, huge public benefit. What about that? Well, Your Honor, the circumstances of each case are unique, and it seems doubtful that the result, given the unique circumstances of this, in any case, frankly, would itself stand as a disincentive for attorneys to take on cases that they believe may qualify for an award under the statute. The statute will remain upon this court's affirmance of the very substantial award given by the court here to Mr. Friedman and his firm. The statute itself will stand as a powerful incentive to attorneys to take on cases that they believe may qualify for an award, just as the legislature intended. Counsel, with all due respect, Judge Smith has just clarified the state now isn't contesting fees. That wasn't the case very recently. It seems, I'm just not so sure that the next attorney is going to feel incentivized to take this up. This is a huge risk. I think it was 12 years, so there's the delay, there's the expense, the risk. I'm just not sure I have a, maybe that's the best answer you can give me, but I'm not persuaded that this shouldn't be a real concern for us. Well, Your Honor, you have raised a few points about the private attorney general award statute, and I'd like to address those. Sure. Private attorney general award, excuse me. Uh, first of all, with respect to the hours sought, there are important reasons why the court did and was justified in reducing the hours that Mr. Friedman sought, apart from the question of whether the characterization of the party's roles. Indeed, Mr. Friedman was asked at the outset of the case to assist Mr. Carmen. No, five times the number of hours sought by Mr. Carmen. During the fee, there were a number of other indications that Mr. Friedman's fee request was highly excessive, padded, was excessive and unreasonable. In those circumstances, under this court's decision in Gates, the California decisions in Warren versus Kia and in Ketchum, the court was entitled to deny a fee award altogether where it determined that the fee request was excessive. Let's just say arguendo that the district court was right in terms of reducing the hours. But in what the case law to me says is, if there was a substantial benefit conferred to the public, even if you take the reduced start, the basis from which the multiplier comes, that the multiplier should reflect the public benefit. And if that's the case here, would the district court not be incorrect on that point? If you assume for a moment that her reduction of all the hours and so on is correct, wouldn't you still need a multiplier to multiply times that base to reflect the public benefit that's been conferred here? No, your honor. And there's an important reason why this court in Morales versus the city of Santa Fe at 96F3, 359, I can give you a pin site, 364, page 364, noted that, well, first of all, there's a strong presumption that the Lodestar figure represents a reasonable fee. Beyond that, at note nine, it identified that there are numerous factors that are subsumed in the award of a fee under the private attorney general statute. And those include, among other things, the benefit conferred, the results obtained, the contingent. How does the Lodestar, forgive me, counsel, how does the Lodestar account for risk and delay? In this case, it was a very, very long delay. How does that get accounted for in the Lodestar? Well, with respect to contingent, the contingent nature of the award, your honor, that's part of the calculus in determining eligibility for an award, essentially, because the contingency, the risk of loss, is a part of factoring into what was the financial incentive to the attorneys to accept the case. That's measured in determining whether there was a sufficient financial incentive for the parties to pursue the litigation to begin with. If there was, then there's no entitlement to a section 1021.5 award. But under Captain versus Moses, the California Supreme Court talked about the importance of the contingent element of this. And here you've got a number of lawyers who have real expertise in this rather arcane area of the law. It brought about an enormous benefit, and it took a long, long, long, long time. Why would that not argue in favor of a multiplier, even if you start with the lower base? And I know Dean Chemerinsky disagrees with that. But nonetheless, the multiplier aspect, doesn't that have to take that into account? Your honor, with respect to the contingent nature of the representation, there is a significant difference with respect to Mr. Friedman's role. And this is important under the circumstances of this case. As Mr. Karman testified, Mr. Friedman received payment for his work on this case, $218,000. He disputes the amount. But Mr. Karman and the district court found Mr. Karman's, of course, his testimony as to their relationship to be credible. And Mr. Friedman has not denunciated any clear error in those determinations. So he was paid- Counsel, to be consistent, HLB got a 1.5 multiplier, kind of a low multiplier. I think she recognized, district court recognized, this is public taxpayer money. I understand that. But you're speaking now to Judge Smith about Mr. Friedman being paid something during the course of the 12 years. So was HLB. It was paid in tune. In fact, it didn't take this on initially, this work on a contingency. That happened starting in November of 2009 when the larger institutional clients couldn't pay anymore. Hence, which sort of factors in, who's going to take this up? The larger clients ran out of fees to finance this litigation, sir. I don't think we can have it both ways. Your Honor, there were critical differences that the district court found between Huber-Lundy's and Mr. Friedman's fee requests. Okay, I'm waiting. Go ahead. Mr. Friedman's, the court found, was essentially padded. There were 3,300 hours devoted solely, as we identified, for reviewing and considering materials in the case. That's a huge number of hours for you. Yeah, but that doesn't speak to the multiplier. She deducted from that and then gave no multiplier. I'm talking about multiplier. Right, but Your Honor, part of the district court's calculation was that Mr. Friedman did not play a lead role in determining strategy in moving the case. Huber-Lundy did for its clients, and Mr. Karman played that role for the petitioners. The nature of the work the district court found did not warrant, the supporting role did not warrant the application of a multiplier. With respect, counsel, that's the one place when, of course, district courts are typically in a better position, but that's the one place when we're talking about conversations between counsel that went on in-house years later where we really can't see behind the curtain, right? This wouldn't be the first time. I've noticed two things in my career. When litigation goes bad, lawyers point fingers, and when litigation goes real well, there's a lot of people in line to take credit, and maybe even, in good faith, to remember conversations differently about who had which idea first. But at this point, we are where we are, and it strikes me that this comes back to this fundamental problem I've got with treating Mr. Friedman as a, quote-unquote, subordinate, when he really had to be almost parallel, it seems to me, given Mr. Karman's circumstances. Your Honor, there are important reasons beyond the ones that support the district court's determination not to award Mr. Friedman a multiplier. It did find that there were mischaracterizations of the record. But counsel, wait a minute. Hold it. Excuse me. That's why this is getting double-counted, right? I'm giving you that, that there was a reason to lop off hours. If you could just focus, I think all three of us now have asked you to focus on just the multiplier. Okay. Well, again, right? Risk, contingent, delay, those factors, public interest. Well, as far as the public interest or the benefit that was conferred, Your Honor, this court has made clear that in cases where there's substantial funds involved, given the size of the class, there's essentially a windfall that plaintiffs would receive if we were looking at this under a percentage of a common fund framework. Of course, that's not involved here. We're looking simply at the 1021.5 award, but that's relevant if the court is inclined to consider the public benefit conferred. And I'd like to just briefly as well, there is no support for the $3 billion benefit that petitioners allege. Wait a minute. Wait a minute. The state vigorously opposed the attorneys getting money set aside from the recovery. And you wouldn't have cared at all what portion the attorneys got if they had been paid out of the common fund, but you oppose that. You really can't have it both ways, can you? They can't get paid out of that, arguendo. Why shouldn't they get some benefit on the public benefit theory aspect of the multiplier? Well, Your Honor, the Lodestar figure, the unenhanced Lodestar figure is a presumptively reasonable fee. They're really separate. They really are separate determinations. I appreciate that, but the Lodestar kind of, the multiplier, certainly as I understand it, you set the Lodestar fee, you make all those calculations, and then the court determines whether a multiplier is appropriate. And in this case, essentially the court said no multiplier. So I think certainly, I think all of us are asking, why no multiplier in this case? It's very clear that a lot of these health care providers clearly benefited. The district court has already determined that this was very much in the public benefit, in the public interest. Isn't that the underlying theory behind AGA funds for attorney? Give them an incentive to be involved in benefiting the public? Your Honor, I don't think that's not specifically that factor. The results that were obtained, the benefit that was conferred on the public is part of the entitlement, establishing the entitlement to an award, and that doesn't get double counted. There are a couple of factors that I haven't addressed. One is the issue of delay. Mr. Freeman was awarded an hourly rate based on current prevailing rates. So the delay in the length of time that this case has proceeded already is incorporated in the hourly rate that the court awarded. So the delay also does not stand as a sufficient factor. I would just commend the court to, again, the Morales case that I cited earlier that identifies the double counting. At risk of taking you substantially over time, I do wish to get a little response from you with respect to common fund. Judge Snyder denied the common fund recovery on the assumption that subparagraph C applied. And she said, well, subparagraph C says that you can't get this if it requires a modification of the internal practices of the state. And this would require that. And therefore, did you argue under section C that section C applied and that was the limitation? We did, Your Honor. We believe that subsection C does apply. In other words, you're willing to concede that common benefit for our purposes here is the same as common fund? Well, Your Honor, there are... The argument you apparently made in front of Judge Snyder, are you backtracking from that argument? No. Well, Your Honor, what we argued is that the subsection C covers claims made under either a common benefit or a common fund theory. And the language of the provision is clear. It refers to an application for fees under a common benefit theory or any other theory in which recovery is sought against the parties benefited. That is plainly intended to include a request for fees under the common fund award. Hooper Lundy made that representation. Okay. So section C, in your view, subsection C does apply. I'm having trouble actually modifying its internal practices, even if the money had never been distributed. So we weren't worried about clawback. We weren't worried about reducing funds in the future to sort of reconstitute the common fund that had already been expended. That's going to require some change in the computer program of the state, right? Absolutely, Your Honor. Okay. That means then that modification of internal practices cannot mean, well, I've got to change my computer program because the very assumption of common fund even without any initial dispersal requires some changes. So modification of internal practices has to mean something other than changing your computer programs, doesn't it? Uh, I, you know, Your Honor, I can't say what was in the minds of the drafters of this provision. I believe that... I'm just, I'm with you. I'm looking at the words, but I'm also trying to figure out what could they possibly have meant when it is assumed that had there been a common fund that had not previously been dispersed, some portion of it was to go to Mr. Friedman. Uh, and I understand that the court has to say, well, you can't modify your internal practices, but in order for some of that money to go to Mr. Friedman, the computer programming has to be changed. Right. Or at least it has to be employed. It's not the case that the state of California doesn't have a mechanism already set up to recoup where there's overpayments. That exists. So it certainly has to be employed, right? This, this talks about modifying that mechanism. That's a prospect altogether. Do we have anything in the record that indicates that California's existing system to recoup where there's overpayments or errors or fraud in, in other circumstances, that that would have required modification as opposed to just using it? Um, uh, Your Honor, if I, if I may, uh, first of all, the focus on the modification of internal practices is with all due respect, a bit of a red herring that the. Well, counsel really helped me to answer the question. Oh, I'm sorry, Your Honor. Um, I, I, I, you're not denying that California has a mechanism to recoup where there's overpayments or fraud, right? That's, I don't hear you saying that here or in your briefing, just to be clear. Absolutely. The state does have a mechanism. What it is a huge undertaking, however, to. That's different. Sorry. I don't mean to but we're way over time. So if you could go back now to your, to, to what Judge Fletcher was getting at in terms of modifying that system, as opposed to just employing it, using it. I certainly read the settlement agreement is saying that the state was not going to agree to modify that apparatus. My question is, is there anything in the settlement agreement that prevents employment of that app using that apparatus? Absolutely, Your Honor. And okay. What is it? I was just about to make it at the outset of my remarks, but I, I wanted to address your question. Uh, it's the, the, the phrase just before the reference to modifying internal practices in subsection C of the settlement agreement. It says that, uh, plans counsel should not assert any argument. I'm reading from the agreement right now that would require DHCS or any other state agency to utilize its resources or modify its internal practices. So utilize its resources. That's something else, right? This wasn't going to cost the state any money that I'll grant you, but how, how do we, you're putting a lot of weight on utilize its resources. Uh, because Your Honor, it, to, um, recover, to withhold funds in order to, uh, to claw back funds, to pay a common fund fee award without a doubt would require the department to utilize its resources and modify its practices because, and, and, and I, I refer Your Honors to, um... You know, I've got the same problem with that argument as with your argument with respect to modifying the internal practices. I mean, assume the best possible case for getting money out of a common fund. That is to say there is a common fund. It has not been distributed to any of the beneficiaries of the, uh, of the judgment. And the state is going to give some portion of that to the attorneys. It will cost the state some money to do that. And that means if costing money to do that counts as resources, you'll just nullify subsection C. So... It would be another unrecoverable component. Right. Um, Your Honor, I'm, I'm, I'm not certain that I am not following the argument. I think what subsection C is, it prevents the claim that's being made that the state should be obliged to utilize its, its resources to recover the, the funds. So... Let me try it this way if I could. What if there were, were, what if the mechanism were employed and there was a clawback or a proportional reduction and, and I agree with Judge Fletcher, that's going to cost the state what I'm going to call an administrative expense, a significant one. And what if the deal were the state gets reimbursed for that off the top? And then there's another reduction because as Dean Chemerinsky has acknowledged, some of these providers aren't in business anymore. So that comes off the top. Um, but there would still be, it seems to me, a, a, this is the hypothetical, but there would be a pool of funds left. Why is that barred by the settlement agreement? Uh, because the settlement agreement prohibits the, uh, the, the petitioners from seeking, from making any argument that the department should be required to utilize its resources or to, uh, to employ those mechanisms to recover the funds. And even if, uh, uh, even if that renders the subsection C, um, inapplicable or ineffective here, the settlement agreement also, uh, provides specifically, uh, that, that there's a, uh, a release of all attorney fee claims, uh, that are not addressed by the settlement agreement. So if this is a claim that is outside the scope of the settlement agreement, it is also directly barred by the express terms of the agreement. Um, it's, it's, it's in paragraph C2 as well as the beginning of C1. It's plainly sets out that the party's release of any claim for fees that's not specifically addressed in the settlement agreement. The, the substantial, uh, effort required, um, is identified in, in, uh, that would be required to recoup, uh, funds is identified in the, uh. We understand that it would take some effort. We, we get that. Any, any further arguments? Um, you're well over, you're well over time. Um, uh, well, your honor, we do believe that the, I just like to address that the point that Mr. Chemerinsky has suggested that, uh, the, the subject C doesn't apply because it's, uh, because they're asking the department to assist the court in recovering the fund and not the plaintiff's counsel. That is a far too narrow, uh, resubmit reading of the, of the... I think we understand the argument. Thank you. Thank you counsel. Thank you very much. Uh, Dean Chemerinsky, you'd ask to save three minutes. We took the other counsel well over time. Let's put three minutes on the clock and see what happens. Thank you. This litigation is going on since 2008. To this point, Mr. Friedman has recovered a total of $55,000 from Medicaid defense fund. Mr. Carmen never received any funds. Let me start with 1021.5. It was an abuse of discretion to not apply a multiplier. I would direct this court's attention to its decision in Stetson versus Grissom, 821 F3rd 1157, written by Judge Smith. And he wrote, the district court must, and must is italicized, apply a risk multiplier to the lodestar. When one attorney's take a case with the expectation they receive a risk enhancement, they prevail. Two, their hourly rate does not reflect that risk. And three, there is evidence the case was risky. Failure to apply a risk multiplier in cases that meet these criteria is an abuse of discretion. I, I, I agree with that. But let me just ask you this. Let's just say, argument, we're putting aside for a moment the common fund issue, but let's just say that we agree that the multiplier, a failure to apply a multiplier was an abuse of discretion. Do we have to send this back to Judge Snyder or can the court of appeal itself apply the multiplier based upon some base figure? I would hope that court of appeal would do that and use your appellate commissioner to do this. To send this back to the district court and then have it appealed back to you is going to take several more years. This case already feels like bleak house. I think this court has knowledge of the case with an appellate commissioner can do that. Also, we don't, we don't have an appellate commissioner anymore. He retired. We sort of have the, we have the mediators who are kind of to be able to decide the multiplier. Also to be able to decide that cutting the hours by 50% was arbitrary. The claim of padding is based on Judge Snyder questioning two billings of thousands and thousands of them. This isn't to use the words of the ninth circuit, a haircut. This was an unjustified restriction. It's important to remember this wasn't seeking money from the public. It was the common trust theory here, the common fund theory that should have been created. Reality is the common fund was not contemplated at the time of the settlement because Judge Snyder had denied that in 2010. The reason why the language is nullified in the way that Judge Fletcher and Judge Kristen said was precisely because the common fund was not anticipated. Here you need to focus on this literal language. It says that the state shall not help the attorneys to collect it. That's not what a common fund is. The common fund would be the court collecting it under these circumstances. So we believe the common fund should exist for the period of 2008 to 2015. And then there should be 1021.5 attorneys fees in 2015 to 2021. But if there's no common fund, then 1021.5 attorneys fees should be for the entire period of 2008 to 2021. Okay, thank you very much. No further questions from the bench? No, thank you. If they were to recover more and you were to receive a lot of it, would you reduce your salary to the state? I'm just kidding. I'm actually not doing any hours. I think this is mentioned in a footnote, Judge. I'm not going to charge for my time for the earlier appeal or this appeal. I'm here because I believe as Judge Kristen said, this is a statute that's meant to encourage lawyers to do what Mr. Friedman did. It's not going to happen if lawyers are treated this way. Thank both sides for your helpful arguments. The case of Independent Living Center in Southern California versus Figueroa is now submitted for decision and we're adjourned. Thank you. Thank you. This part for this session stands adjourned.
judges: W. Fletcher, M. Smith, Christen